**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 1:24-cr-10121-FDS-3 |
| v. | ) | |
| | ) | |
| | ) | |
| DANIELLE STEENBRUGGEN | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Now comes the defendant, Ms. Danielle Steenbruggen, before this Honorable Court, and respectfully submits the following memorandum in support of her request that this Court sentence her to eighty-seven (87) months of incarceration followed by sixty (60) months of supervised release.  Such a variant sentence is sufficient but not greater than necessary to achieve the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

**BACKGROUND**

Ms. Steenbruggen is a "smart, caring, funny, fun-loving and helpful" forty-four-year-old mother, daughter, and sister.  (PSR ¶ 110).  Growing up in Melrose, Ms. Steenbruggen experienced good familial relationships, feeling loved and cared for by her parents Ronald and Diane.  (PSR ¶ 104).  She was raised with her two brothers, Brett and Derek, both of whom now live in Chester, New Hampshire with their families.  (PSR ¶ 107-108).  Ms. Steenbruggen has maintained close relationships with her family members and communicates with them frequently.

Ms. Steenbruggen graduated from high school and completed various courses at UMass Dartmouth.  (PSR ¶ 132).  She worked as a bartender for several years,

before working at a call center, making approximately $1,500 per week. (PSR ¶ 134-135).  Around 2015, Ms. Steenbruggen suffered a significant ankle injury when she was dirtbike riding.  She was riding on a track and thought she was coming up on a "tabletop" type jump with a plateau after it, but there were instead two jumps in a row and she crashed, shattering her left ankle.  This resulted in major surgery, and it took her over a year to recover, alternating between various casts and boots, being unable to put weight on it during that time. (PSR ¶ 116).  She had two plates inserted on each side of her ankle, held in place with pins and screws.  She was prescribed oxycodone in connection with this injury, and this contributed to her transition to hard drugs.  (PSR ¶ 126, 128).  Ms. Steenbruggen, who had prior, but less severe, substance use issues, became addicted to the painkillers and turned to illicit substances to self-medicate when the prescription medications were insufficient. (PSR ¶ 126).

Ms. Steenbruggen developed an addiction primarily to opiates, although she was also addicted other drugs during different periods.  After her injury, her addiction was not severe enough to prevent her from being able to mask it, and she continued to maintain employment and was able to sufficiently deny the depth of her addiction and its underlying causes to her family members, such as her mother, when confronted about it.  However, Ms. Steenbruggen's drug use increased significantly after her father died unexpectedly from a tear in his stomach lining in 2022. (PSR ¶ 105, 126, 128).  This had a devastating impact on the family and on Ms. Steenbruggen in particular.  Her substance use issue escalated after her father's unexpected

2

passing, and it deepened because she put a wall up between her emotions and her family, even though they were suffering the same loss.  Ms. Steenbruggen then suffered a number of other losses and deaths after her father's passing, which only exacerbated her drug use.  Most significantly, loss of custody of her son caused her significant trauma that crippled her ability to break the addiction cycle.  Her mother recognizes now that she did not understand that magnitude of Ms. Steenbruggen's pain at this time, and was consumed with grief herself.

Ms. Steenbruggen has been in a relationship with Carl Decotis for fifteen years.  (PSR ¶ 112).  Together they are parents to their son, Jacob, who is now twelve years old.  (PSR ¶ 112).  Their relationship is strong but for the substance use issues they struggled with.  In 2022 they lost custody of Jacob due to their addiction, but worked with the Massachusetts Department of Children and Families (DCF) towards reunification.  Although Carl is currently incarcerated in connection with drug distribution, he prioritized his sobriety and obtained employment prior to his incarceration in efforts towards reunification with Jacob.  (PSR ¶ 113). Ms. Steenbruggen's brother, Derek, stepped up incredibly in early 2023 and obtained full custody of Jacob through DCF's foster parent program.  (PSR ¶ 112).  Jacob currently lives with Derek, Derek's wife, and their two other children, who are sixteen and fourteen years old.  Jacob is doing well in school and gets counseling in Chester. Jacob's grandmother, Ms. Steenbruggen's mother, sees Jacob several times a week. Ms. Steenbruggen talks to Jacob almost every day.

Ms. Steenbruggen experiences "profound remorse" in connection with her actions, stating that, as she reflects on her choices "with a clean and sober mind, [she] [is] ashamed of the decisions that led [her] to this point." (Ex. A). This case was a significant wakeup call for Ms. Steenbruggen, and, as she writes the court, she is grateful for it. (See Ex. A) (writing that "[t]he gravity of [her] actions weigh[] heavily on her," that she could never forgive herself for causing harm or death to someone as a result of the drugs she sold, and that she is "grateful every day that law enforcement intervened when they did, preventing further damage"). And she has put these reflections into action, demonstrating changed behavior not just a changed mindset. Ms. Steenbruggen has been sober since her arrest. She has completed hundreds of hours of programs, evident from her extensive transcript and hundreds of program certificates. She has also taken it upon herself to design monthly fitness routines for herself and other women incarcerated at Wyatt Detention Facility. (Ex. A). She hopes to participate in further mental health and drug treatment, and wants to pursue real estate and personal trainer certifications through the Bureau of Prisons, if offered. (Ex. A). Ms. Steenbruggen writes that she is "committed to exploring every opportunity to expanding [her] skills and boost [her] career prospects" while incarcerated, "preparing for a successful re-entry into [the] community." (Ex. A). She has no disciplinary tickets. She is thankful that her son is in good hands with her brother, and she remains in constant contact with him.

Ms. Steenbruggen looks forward to continuing her hard work upon release. She will work closely with DCF to surpass their expectations for reunification with

Jacob.  Ms. Steenbruggen's mother reports that Ms. Steenbruggen is welcome to live with her upon release, and can help financially if DCF determines that a different arrangement is best, such as an apartment in the same town that Jacob lives in.  Ms. Steenbruggen's support system is vast and strong; her family will be with her every step of the way.

Ms. Steenbruggen strives to return to the empathetic, focused, productive member of society she was, recalling fondly in particular her efforts supporting Matt's Place and helping a young man with muscular dystrophy accomplish the world record cross country journey in his wheelchair.  (Ex. A).  Her family knows that Ms. Steenbruggen "is a kind, loving, and compassionate woman who wants nothing more than to heal, make amends, and be the mother, daughter, sister, and friend that we all know she truly is."  (Ex. B).

## APPLICABLE GUIDELINES AND RECOMMENDED SENTENCE

Ms. Steenbruggen pled guilty to conspiracy to distribute and to possess with intent to distribute 5 grams and more of methamphetamine in violation of 21 U.S.C. § 846 (in connection with Count Two of superseding indictment) and possession with intent to distribute, and distribution of, 5 grams and more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (in connection with Count Three of superseding indictment).  The parties entered into a Rule 11(c)(1)(C) plea agreement.  In that plea agreement, the parties agreed that the defendant's total offense level is 31, based on a base offense level of 34, decreased by three levels for her acceptance of

responsibility. The parties agreed upon a disposition of incarceration within a range of 87 to 108 months, with 60 months of supervised release.

The Probation Department calculated Ms. Steenbruggen's total offense level as 31, with a base level of 34, see USSG §§ 2D1.1(a)(5) and (c)(3), and a three-level decrease for her acceptance of responsibility. (PSR ¶¶ 69-78). With a criminal history category of III based on a score of six, Ms. Steenbruggen's guidelines range would be 135 to 168 months.

In sentencing Ms. Steenbruggen and determining the appropriateness of her requested sentence, Ms. Steenbruggen suggests that this Honorable Court should assign little meaning to the guidelines' distinction between actual methamphetamine and methamphetamine mixture.[1] Recent case law has addressed the disparity in the sentencing guidelines between "methamphetamine mixture" and "actual methamphetamine." See e.g. United States v. Celestin Jr., No. 21-125, 2023 WL 2018004, at *3-4 (E.D. Louisiana, 2023) (discussing increasing number of Courts that are deviating from the Sentencing Guidelines distinction between actual methamphetamine and methamphetamine mixture and applying the methamphetamine mixture Guidelines to all methamphetamine violations). Particularly persuasive is United States v. Bean, 371 F. Supp. 3d 46, 49-54 (D.N.H. 2019), S.C. United States v. Bean, 759 F.Supp.3d 306 (D.N.H. 2014) (modifying

---

[1] Ms. Steenbruggen objected to the distinction of "actual methamphetamine" and "methamphetamine mixture" in the presentence report. The Probation Department did not make changes to the report but recognized that the argument could be a basis for the variant sentence that Ms. Steenbruggen is advocating for. (PSR at 41).

criminal history score and category).  There, the Court concluded that the guidelines were owed less deference as to this issue because there "appears to be no empirical basis for the Sentencing Commission's harsher treatment of offenses involving a higher purity of methamphetamine" and that no "empirical data appears to justify the guidelines' 10:1 ratio." Id. at 51.  The Bean Court further noted that the notion that methamphetamine purity is an "indictor of a defendant's role in a drug" offense is "divorced from current market reality" because since 2017, the average methamphetamine purity as found by government testing was 96.9%. Id. at 52.  The Court therefore found that "purity of methamphetamine is no longer an accurate indicator of culpability." Id. at 53.  Last, the Bean Court found that "methamphetamine offenses receive far more severe sentences than any other drug" such that the methamphetamine guidelines create unwarranted sentencing disparities with sentences imposed on other defendants with similar culpability but for different drugs. Id.  Given the lack of empirical data to support such a disparity, the Bean Court held that the guidelines' distinction between actual methamphetamine and methamphetamine mixture to be untenable. Id. at 53-54. Ms. Steenbruggen asks this Honorable Court to consider that the artificial distinction between actual methamphetamine and methamphetamine mixture supports the requested variant sentence.

Consistent with the plea agreement, Ms. Steenbruggen recommends a sentence of 87 months' incarceration to be followed by 60 months of supervised release.  This variant sentence is warranted because of Ms. Steenbruggen's

immediate willingness to take responsibility for her actions, her role in the offense, her extremely positive behavior from her initial arrest to date, and in consideration of the artificial distinction between methamphetamine and mixture. Ms. Steenbruggen also submits that her criminal history is overstated by the Guidelines, which consists of non-violent offenses arising from her addiction.

Ms. Steenbruggen's role in the offense materialized when her roommate James Adams (now a codefendant in this case), who was involved in drug distribution, went to jail. To keep up her habit, she agreed to help facilitate several transactions for which James had been the point of contact while he was in jail. Ms. Steenbruggen acted as an intermediary for transactions at issue in this case. She recognizes now the impact that these poor choices had on others, her family and strangers alike. She has worked hard to better herself so that she never repeats these mistakes, completing numerous substance use courses and many other programs while incarcerated, and dedicating herself fully to sobriety. Her primary motivating factor is the possibility of future reunification with her son Jacob, and she knows he deserves better from her and she has committed to doing everything in her power to be the best mom she can be to him, both now, and when she rejoins her community.

## CONCLUSION

Ms. Steenbruggen requests that she be sentenced to eighty-seven (87) months

of incarceration followed by five years of supervised release.

Respectfully submitted,

**Danielle Steenbruggen,**

by her attorney,

*/s/ Jason Benzaken*

Jason Benzaken, Esq.
Benzaken, Sheehan & Wood, LLP
1342 Belmont Street, Suite 102
Brockton, MA 02301
(Tel) 508-897-0001
(Fax) 508-587-5455
BBO No. 658869
*jbenzaken@bmswlaw.com*

DATED:  November 18, 2025

## Certificate of Service

I hereby certify that a copy of this motion has been filed and served on counsel
for the United States via CM/ECF.

*/s/ Jason Benzaken*

DATED:  November 18, 2025