UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

vs.

DANIELLE STEENBRUGGEN
a/k/a "DANIELLA,"

Defendant.

Criminal No. 24-cr-10121-FDS

## GOVERNMENT'S SENTENCING MEMORANDUM

Danielle Steenbruggen, a/k/a "Daniella," has spent the majority of her adult life involved in the criminal justice system. Serious convictions, jail time, and probation have repeatedly failed to deter the defendant from reengaging in criminal conduct, and even more concerning, her conduct has escalated to large-scale drug trafficking in recent years. Leading up to this investigation, the defendant was arrested in December of 2022 (and subsequently indicted, which is pending) after a state search warrant in Peabody on her residence recovered significant amounts of crystal methamphetamine, fentanyl, psilocybin mushrooms, counterfeit bills, and a piranha in a fish tank inside the property.

In the instant case, beginning in the Fall of 2023, the defendant and her co-conspirators – several of which were members and associates of the Unknown Bikers Motorcycle Club ("UBMC") – engaged in the sale of approximately 10 pounds of methamphetamine, seized by law enforcement officers who conducted over twenty controlled purchases of narcotics, largely crystal methamphetamine, and four guns. Following the state arrests of several of her co-conspirators, the defendant pivoted and introduced another pound-level supplier of methamphetamine into this investigation. After the drug buys in this case, law enforcement arrested the co-conspirators, including the defendant's arrest in June of 2024. During that arrest,

1

law enforcement officers recovered a co-conspirator's license from the defendant and a phone that they shared, where a subsequent cell phone extraction revealed further evidence of drug distribution transactions.

A 108-month sentence in this matter would communicate a clear message to the defendant, that society has laws that she simply must follow.  The defendant is not merely a drug dealer.  And she is not merely an individual who willingly, and repeatedly, disregards the terms of her probation and pre-trial conditions of release.  Instead, she is every one of these things. Not just because I say so, but because she has earned these characterizations during her life of crime.

On June 11, 2024, the defendant was charged by criminal complaint with conspiracy to distribute, and possess with intent to distribute, methamphetamine, in violation of 21 U.S.C. § 846. On September 18, 2024, the defendant was charged in several counts of a superseding indictment, including for conspiracy to distribute and to possess with intent to distribute 50 grams and more of methamphetamine, in violation of 21 U.S.C. § 846 (Count Two); and possession with intent to distribute 50 grams and more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(a)(viii) (Count Three).  On August 20, 2025, the defendant pleaded guilty to so much of Count Two of the Superseding Indictment as alleges conspiracy to distribute and to possess with intent to distribute 5 grams and more of methamphetamine, in violation of 21 U.S.C. § 846; and so much of Count Three as alleges possession with intent to distribute, and distribution of, 5 grams and more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii).

The Pre-Sentence Investigation Report ("PSR") calculates the defendant's Guidelines Sentencing Range ("GSR") as 135-168 months (11.25-14 years) imprisonment. There is also

mandatory-minimum term of 60 months incarceration. In the binding "(C)" plea agreement, the parties agreed to a range of incarceration of 87-108 months. For the reasons set forth below, the government recommends a sentence of 9 years (108 months) in prison, to be followed by 5 years of supervised release.

## I.    THE ADVISORY SENTENCING GUIDELINES

The PSR issued by U.S. Probation determined that the defendant was accountable for 1.4 kilograms of converted drug weight, resulting in an offense level of 34. See PSR at ¶69.  The offense level was reduced three levels for defendant's timely acceptance of responsibility under USSG § 3E1.1.  See PSR at ¶¶76, 77.  The defendant has numerous prior criminal convictions, resulting in six criminal history points. PSR ¶ 90. Accordingly, her base offense level is 34 and her criminal history category is III. See PSR at ¶142.  The PSR lists defendant's advisory GSR as 135-168 months' imprisonment, see PSR at ¶142, with a 5-year mandatory minimum.  See PSR at ¶141. The government agrees with the PSR's calculation of the GSR.

## II.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The factors set forth in 18 U.S.C. § 3553(a) assist the Court in determining a sentence that is sufficient, but not great than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence for criminal conduct, to protect the public from further crimes of the defendant, and to provide for the needs of the defendant. They also require courts to consider the kinds of sentences available, and the GSR.

Consideration of the § 3553(a) factors demonstrates that a sentence of 108 months, followed by 5 years of supervised release, is the appropriate sentence in this case.

### a.  **Nature of the Offense**

The nature and circumstances of the defendant's drug trafficking justify a significant sentence of 108 months.  In analyzing the defendant's conduct and eventual arrest, the Court should first consider the brazen nature of the defendant's drug trafficking, while first having pending state charges for a 2022 arrest in Essex County for trafficking of methamphetamine and fentanyl, and then involving herself in this large-scale methamphetamine distribution conspiracy.

### i.  Background

The defendant's arrest was a result of a joint federal, state and local investigation, dubbed "Operation Crystal Road" that commenced in 2023, with the objective of disrupting the trafficking of large amounts of methamphetamine in the eastern Massachusetts area by members and associates of the Unknown Bikers Motorcycle Club ("UBMC"). During the course of this investigation, law enforcement officers conducted over twenty controlled purchases of narcotics, largely crystal methamphetamine, and guns, during recorded deals that occurred with regularity in eastern Massachusetts. Investigators made additional seizures, and ultimately recovered approximately 10 pounds of crystal methamphetamine, along with four firearms.

Under the ATF's direction, an ATF cooperating witness ("CW-1") and an undercover law enforcement officer ("UC-1") made a series of controlled purchases, which were largely recorded, from the defendant, as well as Daniel LOUGHMAN a/k/a "SWISS" ("LOUGHMAN"), James SNOW a/k/a "TANK" ("SNOW"), and James ADAMS a/k/a "JIMMY" ("ADAMS"), four individuals connected and known to one another through LOUGHMAN in the trafficking of large amounts of methamphetamine in the eastern

Massachusetts area. Investigators learned that this was a supplier-based drug conspiracy, where ADAMS and SNOW both worked as sellers for LOUGHMAN, and the defendant was later introduced to CW-1 as an individual who managed the distribution operation for LOUGHMAN and also conducted sales alongside ADAMS.  See PSR at ¶¶ 9 - 10.

ii.   <u>The Defendant's Conduct in the Methamphetamine Conspiracy</u>

As indicated in the statement of offense conduct, the defendant coordinated and participated in numerous controlled purchases with CW-1, alongside several of her co-defendants, including ADAMS and LOUGHMAN. <u>See</u> PSR at ¶¶ 17 – 24. Notably, following ADAMS state arrest for trafficking methamphetamine, the defendant coordinated a large methamphetamine buy for ¾ of a pound, and introduced CW-1 to LOUGHMAN when the buy took place, in ADAMS's residence in Byfield. On that date in February, 2024, CW-1 was directed to drive to ADAMS' residence in Byfield, and when CW-1 arrived, the defendant was present at the home. The defendant informed CW-1 that the product was coming from Wakefield and that "Dan" (LOUGHMAN) would arrive with the product shortly.  LOUGHMAN did arrive, and advised CW-1 that he only had ¾ of a pound of methamphetamine and would be getting resupplied with 9 pounds from New York later that evening. LOUGHMAN handed CW-1 a bag containing ¾ pound of methamphetamine and agreed to a sell a pound of methamphetamine to CW-1 in approximately two weeks. LOUGHMAN also advised CW-1 to contact the defendant to coordinate future transactions.  <u>See</u> PSR at ¶¶ 33 – 36.

Moreover, during this investigation, the defendant showed no signs of slowing down. When LOUGHMAN was also arrested for state trafficking methamphetamine charges, CW-1 made further several controlled buys of narcotics from the defendant and a man identified as Thomas DINGMAN, who she described as a new source of supply. This is also outlined in the

5

STEENBRUGGEN and DINGMAN criminal complaint, *see United States v. Danielle Steenbruggen and Thomas Dingman,* 24-mj-6422, -6423. As stated above, CW-1 coordinated multiple additional 1-pound purchases of crystal methamphetamine through the defendant when, following the arrest of a former supplier of methamphetamine, she advised CW-1 that she could get CW-1 the same price for the same weight with another supplier, and did just that.  See PSR at ¶¶ 39 - 44.

Methamphetamine is a deadly and highly addictive drug that is an increasingly serious problem throughout the United States and in the District of Massachusetts.[1] The proportion of federal drug trafficking cases involving methamphetamine has steadily increased over the past 20 years, accounting for 48.7% of all of drug trafficking cases in 2022, and becoming the predominant drug trafficked over the last decade.[2] Abuse of this potent stimulant is plaguing many parts of the country, and the government has seen a significant rise in the amount of methamphetamine in the District of Massachusetts over the course of the last four years.

Recent national reports have confirmed that methamphetamine abuse is increasing dramatically. The National Institute on Drug Abuse found that among people aged 12 or older in 2021, 0.9% (or about 2.5 million people) reported using methamphetamine within the prior 12

---

[1]  Martha Bebinger, *"Meth Use Is Rising In Boston, Intensifying The Opioid Crisis,"* appearing at https://www.wbur.org/news/2018/11/21/meth-worsening-opioid-epidemic (last updated December 04, 2018).

[2]  United States Sentencing Commission, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System,* appearing at https://www.ussc.gov/sites/default/files/pdf/research-andpublications/research-publications/2024/202406_Methamphetamine.pdf, at 16 (last viewed August 6, 2024) ("USSC 2024 Methamphetamine Trafficking Offenses")

months,[3] and that reflects only those who reported use. Moreover, methamphetamine is one of the most commonly misused stimulant drugs in the world.[4] "The consequences of methamphetamine misuse are terrible for the individual—psychologically, medically, and socially. Using the drug can cause memory loss, aggression, psychotic behavior, damage to the cardiovascular system, malnutrition, and severe dental problems." [5] In addition to these horrific effects on individual health, "methamphetamine misuse threatens whole communities, causing new waves of crime, unemployment, child neglect or abuse, and other social ills." [6]

Among people aged 12 and older in 2020, an estimated 0.6% (or about 1.5 million people) had a methamphetamine use disorder in the prior 12 months. [7] Methamphetamine is second only to fentanyl in causing drug-related deaths in the United States.[8] In 2022, there were 33,355 methamphetamine-related deaths nationwide.[9] Indeed, this crisis has worsened each year

---

[3] See NIDA. "Overview." *National Institute on Drug Abuse*, 24 Feb. 2023, https://nida.nih.gov/publications/research-reports/methamphetamine/overview (last updated November of 2024).

[4] Id.

[5] Id.

[6] Id.

[7] Id.

[8] Drug Enforcement Administration, *2024 National Drug Threat Assessment*, appearing at https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf, at 3 (last viewed July 17, 2025) ("DEA 2024 Assessment").

[9] National Center for Health Statistics, *VSRR Provisional Drug Overdose Death Counts*, appearing at https://data.cdc.gov/d/xkb8-kh2a (hereinafter, "2022 VSRR Overdose Death Counts") (last updated July 16, 2025).

since 2015. [10] The Centers for Disease Control and Prevention found that overdose deaths from psychostimulants, comprising mostly methamphetamine, increased by 703% from 2011 to 2021.[11] Moreover, the Drug Enforcement Administration found that 31% of drug-related deaths in the United States are caused by psychostimulants – mostly methamphetamine.[12] As of June 2, 2024, there were at 34,595 methamphetamine-related deaths nationwide for the prior 12-month period.[13]

Equally devastating, as methamphetamine production has shifted from makeshift, local labs to sophisticated Mexican laboratories, methamphetamine production and purity have increased exponentially.[14] Purity of methamphetamine has risen to nearly 100%. Indeed, in this case, investigators seized approximately 7 pounds of methamphetamine, and 6 of those pounds were between 98% and 100% pure methamphetamine. As the New York Times has reported, this combination of increased production and increased purity has been particularly lethal: "There is more meth on the streets today, more people are using it, and more of them are dying." [15]

---

[10] Id.

[11] USSC 2024 Methamphetamine Trafficking Offenses, at 6.

[12] DEA 2024 Assessment, at 6.

[13] National Center for Health Statistics, *National Vital Statistics System, Provisional Drug Overdose Death Counts,* appearing at https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last accessed June 24, 2024) (hereinafter, "2024 VSRR Overdose Death Counts").

[14] Frances Robles, "*Meth, the Forgotten Killer, is Back. And It's Everywhere*", The New York Times, February 13, 2018, appearing at https://www.nytimes.com/2018/02/13/us/meth-crystal-drug.html (hereinafter, "Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere*") (last updated February 13, 2018).

[15] Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere.*

In recent years, methamphetamine has become much more prevalent in the Northeast.[16] Most of the methamphetamine supply is produced in Mexico and transported to the United States.[17] That is because methamphetamine produced in Mexico presents a lower cost, higher purity, and higher potency alternative.[18] Due to its low costs of production and maintenance, combined with the expansion of Mexican drug cartels into major United States cities and their extensive drug distribution networks within local communities, methamphetamine remains in constant supply and is easily accessible.[19] Purer, cheaper methamphetamine leads to more deaths. The number of methamphetamine overdoses in Massachusetts alone increased threefold from 2018 to 2022 (growing from 70 deaths to 210).[20] Between June 2023 and June 2024, there were 215 methamphetamine-related overdose deaths in Massachusetts.[21] In fact, "[t]he rate of all drug-related E[mergency] D[epartment] visits was highe[r] among patients residing in the

---

[16] U.S. Department of Justice Drug Enforcement Administration, *2020 National Drug Threat Assessment*, available at https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf, at 23 (last viewed July 17, 2025) (hereinafter, "DEA 2020 Assessment"); Streck, Joanna M et al., *Injection of Methamphetamine Has Increased in Boston, Massachusetts: 5 Waves of Centers for Disease Control and Prevention State Surveillance Data*, 17.3 J. OF ADDICTION MEDICINE 349–352 (2023) (last viewed July 12, 2023).

[17] DEA 2024 Assessment, at 31.

[18] Id.

[19] Id. at 3 – 16.

[20] 2022 VSRR Overdose Death Counts.

[21] 2024 VSRR Overdose Death Counts.

Northeast[ern United States] (2,531 per 100,000 [residents])" than any other region in the nation.[22]

Even when not lethal, the physical and emotional effects of methamphetamine abuse are dramatic. Methamphetamine has a horrific impact on its users and on the community. Methamphetamine is a tremendously addictive drug, which can cause dramatic physical and emotional changes on those who use it, including increases in aggressive and violent behavior.[23] The physical effects on users are well-documented. The emotional changes are equally devastating:

> Chronic abusers may exhibit symptoms that can include significant anxiety, confusion, insomnia, mood disturbances, and violent behavior. They also may display a number of psychotic features, including paranoia, visual and auditory hallucinations, and delusions (for example, the sensation of insects creeping under the skin). Psychotic symptoms can sometimes last for months or years after a person has quit abusing methamphetamine, and stress has been shown to precipitate spontaneous recurrence of methamphetamine psychosis in formerly psychotic methamphetamine abusers.[24]

---

[22] Substance Abuse and Mental Health Services Administration, PEP22-07-03-002, *Findings from Drug-Related Emergency Department Visits, 2021*, https://store.samhsa.gov/sites/default/files/pep22-07-03-002.pdf (2022), at 9 (last viewed July 17, 2025).

[23] Mark A. R. Kleiman, Jonathan P. Caulkins, and Angela Hawken, *Drugs and Drug Policy: What Everyone Needs to Know* 120 (Oxford University Press 2011) ("There is . . . a much stronger association between violence and regular methamphetamine use. Heavy use of methamphetamine increases the likelihood of attack behaviors and aggression, with the most compelling evidence coming from laboratory studies involving mice.").

[24] National Institute on Drug Abuse, *What are the long-term effects of methamphetamine abuse,* April 7, 2017, appearing at https://www.drugabuse.gov/publications/researchreports/methamphetamine/what-are-long-term-effects-methamphetamine-abuse (last accessed June 24, 2024).

Unlike opioid addiction, there are no approved drugs available for treatment of methamphetamine addiction.[25] Addicted users who choose to stop using methamphetamine may face withdrawal symptoms including severe depression, psychosis, and intense drug cravings.[26] Even methamphetamine addicts who manage to overcome their addiction "will be at risk for relapse for years and possibly for their whole lives."[27]

The defendant's actions have been a direct contributing factor in the ongoing drug crisis in Massachusetts.  The fact that she continues to be involved in drug dealing, having repeatedly been involved in large-scale methamphetamine conspiracies in Massachusetts - and while still having pending state indictments for similar drug trafficking conduct - demonstrates that a significant sentence is necessary to promote respect for the law and to provide just punishment and deterrence in this case.

### b. **Characteristics of the Defendant**

The government acknowledges the prompt acceptance of responsibility by this defendant. However, several aspects of her background stand out. First, the defendant has previously engaged in drug trafficking, along with various other types of crimes, which is relevant to the

---

[25] Carmen Heredia Rodriguez, *"Meth's Resurgence Spotlights Lack of Meds To Combat the Addiction,"* Kaiser Health News, January 14, 2019, appearing at https://khn.org/news/meths-resurgencespotlights-lack-of-meds-to-combat-the-addiction/ (last viewed June 24, 2024).

[26] National Institute on Drug Abuse, *Methamphetamine Drug Facts*, May 16, 2019, appearing at https://nida.nih.gov/publications/drugfacts/methamphetamine (last accessed June 24, 2024).

[27] National Institute on Drug Abuse, *Understanding Drug Use and Addiction Drug Facts*, June 6, 2018, appearing at https://nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction (last viewed July 17, 2025).

facts here. She has now engaged in this same conduct again, while having a pending state indictment, and after having served several prior house of correction sentences.

The defendant also has a lengthy criminal record, and has notably had pending cases, or has been incarcerated on either committed sentences or violations of probation for a significant portion of her adult life. See PSR at ¶¶81 - 95.

The defendant has numerous convictions, including on a variety of offenses. See e.g., PSR, including at ¶82 (shoplifting, sentenced in 2012 to 6 months of probation and subsequently found in violation of that probation); ¶86 (drug possession, sentenced in 2016 to 6 months in the house of correction after a violation of probation where additional charges for distribution of drug paraphernalia and resisting arrest were dismissed); ¶87 (leaving the scene of personal injury and operating a motor vehicle under the influence of drugs, sentenced in 2015 to 6 months in the house of correction); and ¶89 (trespassing, amended down from breaking & entering for felony, and sentenced in 2023 to a 30 day committed sentence in the house of correction after a violation of probation).

As stated above, the defendant had been on conditions of release for a separate drug distribution case in Essex Superior Court for 2022 conduct involving trafficking of methamphetamine and fentanyl (see PSR at ¶ 94), and was also at one point in default on a warrant for 2024 charges for negligent operation in the Peabody District Court (see PSR at ¶95) at the time of her conduct in this investigation. The facts as alleged for the 2022 state case are concerning - where the defendant was indicted for trafficking of methamphetamine and fentanyl, as well as possessing counterfeit money and unlicensed possession of a fish or wildlife – as a result of a Peabody search warrant on the defendant's residence and the recovery of 69.3 grams of crystal methamphetamine, 19.2 grams of fentanyl, 13.8 grams of psilocybin mushrooms,

counterfeit pills, and a piranha in a fish tank.  See *Commonwealth v. Danielle Steenbruggen*, Docket 2377CR0050.

The sentencing in this case deserves to be treated differently than a simple "hand-to-hand" drug dealing case.  Along with the defendant's criminal history, the circumstances here justify the government's recommendation of a sentence that is significant but still below the guideline sentencing range determined by the U.S. Probation office – a sentence of 108 months of incarceration. This, and other arguments raised throughout this memorandum, reflect the government's position that this is a very serious case.

As summarized above, the defendant has convictions for various substantial crimes in her past, and serious pending state charges for drug distribution.  Yet, the most significant sentence of incarceration was 6 months in the house of correction, including after violating her probation, even when given numerous opportunities on prior offenses (see PSR at ¶¶ 86 - 87).  She has failed to learn anything from those experiences, and other equal or shorter terms of incarceration. Accordingly, the defendant should be punished in a manner that communicates to her the seriousness of her criminal behavior.

### c.  Specific and General Deterrence and Protection of the Public

#### i.  The Need for Specific and General Deterrence

The Court should also consider deterring both the defendant and others.  See 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct").

A significant sentence of imprisonment is warranted to deter others from becoming involved in any way, role, or capacity in the trafficking of methamphetamine, as the dangers associated with these cannot be overstated. Individuals tempted to engage in drug trafficking

must understand that any involvement with methamphetamine, no matter how minimal, will have immediate and serious consequences. Imprisonment is necessary to send a strong warning to others who might otherwise consider trafficking these dangerous drugs or assisting those who do.

The defendant has served time in jail before (see PSR at ¶¶ 86, 87, 98), but she has clearly not gotten the message of compliance with society's laws from her prior jail terms.  This sentence needs to make that point unmistakably clear, that his conduct has consequences.

Considerations of specific deterrence also support the imposition of a sentence of 9 years. The defendant simply has not gotten the message despite repeated interventions from the courts. The defendant's criminal history reflects serious convictions, jail time, and probationary sentences, that have only resulted in more criminal conduct. In fact, the only effect these interventions had was to cause the defendant to be more brazen, associating with large-scale methamphetamine suppliers along with members and associates of an outlaw motorcycle club. At the time she began selling crystal meth to the cooperator in this case, she was less than 2 years removed from being arrested for drug trafficking, and she was either detained or on conditions of release for those pending state charges during the entirety of this investigation, as referenced above.

Without a doubt, the defendant herself has dealt with substance abuse issues, as outlined in the PSR. That does not give her the right to sell to others and hurt the community with these large amounts of crystal methamphetamine, or other controlled substances. This Court should impose a significant term of imprisonment to deter this defendant from ever again engaging in drug trafficking.

ii.  **The Need to Protect the Public**

Lastly, and perhaps most importantly, this Court should consider the need to protect the

public from the defendant. <u>See</u> 18 U.S.C. § 3553(a)(2)(C) (the court may impose a sentence to "protect the public from further crimes of the defendant"). The defendant's penchant for drug dealing, coupled with her extensive criminal history, provide a deadly combination that simply must be addressed by the Court's sentence. This could not be made more clearly than from the actions of the defendant herself, in which she clearly, and repeatedly, demonstrated the lengths she'd go to in furtherance of her drug trafficking business.

### d.  Supervised Release Conditions

The government also requests a term of 60 months of supervised release. In addition to the standard conditions, the government requests that the Court impose the special conditions set forth in the recommendations made by U.S. Probation, and below, including associational restrictions and curfew.

### i.  Curfew and Associational Restrictions

The government requests that the Court impose a curfew from 9:00 p.m. to 6:00 a.m. for the first 15 months after the defendant is released from prison or any community corrections confinement (either under BOP or Court supervision). <u>See</u>, <u>e.g.</u>, "Maximum Impact: Targeting Supervision on Higher-Risk People, Places and Times," Pew Center for the States Public Policy Brief (March, 2009) (concluding that Probationers are "at the highest risk of re-arrest during the first few months of community supervision," that arrest rates after 15 months were substantially lowered, and thus recommendation that probation resources be "front-end loaded" to achieve maximum effect). The government also suggests that the defendant's probation officer should be allowed to relax the curfew for work or school and that it be enforced by electronic monitoring.

Further, during the period of supervised release, the defendant should be prohibited from

contacting, or being in the company of her co-defendants (namely, LOUGHMAN, ADAMS, SNOW or DINGMAN) or other individuals who the government asserts are members, associates or affiliates of the Unknown Bikers Motorcycle Club ("UBMC"), many of whom are convicted felons that the defendant is barred by the standard conditions of probation from contacting in any event.

### ii.    Drug testing and Counseling

The defendant should be drug tested while on supervised release and should be given counseling if considered appropriate by Probation. See PSR at ¶¶124 - 132.

### iii.    Vocational and Educational Training

The defendant has limited vocational skills.  The government believes that the Court should make a judicial recommendation that the defendant be provided with any available vocational training while in prison and that she take advantage of any such classes and/or training while on supervised release. See PSR at ¶¶135 - 136.

16

## III.    THE GOVERNMENT'S RECOMMENDATION

For the foregoing reasons, those contained in the PSR, and those to be presented at the sentencing hearing, the government requests the following sentence:

- a term of 108 months' imprisonment;

- a fine within the Guidelines, as calculated by the Court, unless the Court finds that the defendant is not able to pay a fine;

- a term of 60 months' supervised release with the conditions referenced above and recommended by probation; and

- a special assessment of $200.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    /s/ John T. Dawley, Jr.
       John T. Dawley, Jr.
       Assistant United States Attorney

Dated: November 19, 2025

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing upon all counsel of record by electronic filing notice.

/s/ John T. Dawley, Jr.
Assistant U.S. Attorney

Dated: November 19, 2025